Good morning, your honors, and may it please the court. My name is Nova Jansen. I'm very pleased to be representing the appellant in this case today, Mr. Kenneth Sanders. Today, I'd like to focus my argument on why the community caretaking exception of the Fourth Amendment's warrant requirement does not excuse law enforcement's warrantless entry into Kenny Sanders and Karina Leigh Francois's home on February 16th of 2018. We had an unstable situation. There was obviously emotional people there. We had somebody upstairs who we don't know who that person is. We don't know if there are any injuries. We don't know what's going on upstairs. We don't know what's going on in the house. With the emotions that are going on, we've got to make sure everybody is okay. That is what Officer Tom Pregler testified at the suppression hearing as to why he and Officer Cross thought it permissible to enter Mr. Sanders' home without a warrant less than a minute after they arrived in the scene in response to a domestic disturbance call. Now, what's notable is what Officer Pregler didn't say. He didn't say, we went in because we had a report of an assault in progress. We went in because someone was screaming in pain inside. We went in because we had reports of an altercation involving a gun. We went in because we've dealt with Mr. Sanders before and we knew he was a violent and unpredictable guy. He didn't say any of those things and in fact he couldn't say any of those things because if we look at the objective, the objectively available evidence that was available to the police at the moment that they entered Mr. Sanders' house, here's what they knew. Grandma had called 9-1-1 to report that her granddaughter had called and was crying and said mom and dad are fighting really bad. She asked police, I don't know what's going on there. I don't know if there's guns in the house. I don't know. She was upset. Could you just go over and make sure, check and see that everything's okay? She said there's three children in the house, 11, 7, and 1. When police arrived they can see there's a child, probably the 11 year old, in the upstairs window. Flailing their arms or acting excited. They knock on the door. Ms. LeFrancois comes. She answers the door. She has obviously been crying. We can see that in the video. She has some minor scratches. They're not bleeding on her face and her neck. Police ask is everything okay? She says yes, everything's fine. We're all fine. Officers say can we come inside? She says no. They say your daughter called us. She says don't tell him they called you. At this point there's no indication those officers have any interest in going in the house. They say we need to talk to him. We haven't even talked about names at this point. We need to talk to him. And Ms. LeFrancois looks at the officers and she says well, I don't want you to go in. I'll go in. Have him come out. And the officers say okay, that's fine. The only thing that changes is that when she opens that door, you hear a child crying inside the house. That's it. All of a sudden, that's enough for me. But that's not the only thing that reasonable belief is based on, right? I mean, it's the entire narrative that you just laid out. Yes. That we make our determination on, right? So we have a 911 call, a report of possible violence, a report of a child potentially in that situation, a woman who, a victim arguably, who comes out with red marks on her on her throat and an indication about don't tell don't tell the guy who maybe did this that you're here, that the child reported. Isn't that, I mean, it's a reasonable belief is a pretty low barrier, wouldn't you agree? And I understand if you need probable cause here, it might be a different story. But reasonable belief, it seems to me like you're raising the barrier here for what the officers had to know. I respectfully disagree, Your Honor. Reasonable belief is absolutely a lower standard than probable cause. There's no question about that. But in order to establish this community caretaking function applies, we need specific and articulable facts demonstrating that at the moment police made entry into the residence, a trained and experienced police officer would reasonably believe, based on the totality of the circumstances, that there is no time to wait for a warrant because an emergency currently exists inside the residence that requires the officers to make immediate entry. So while absolutely reasonable belief is a lower standard, we can't ignore these additional components of what's required to overcome someone's incredibly important Fourth Amendment right to be free from governmental intrusion, particularly at the threshold of the home, which of course the Supreme Court has told us multiple times is the very core of the Fourth Amendment protections. And at the end of the day, we also have to keep in mind that the ultimate test for any exception to the Fourth Amendment's warrant requirement is, is the government interest sufficiently compelling to overcome that important interest in our own Fourth Amendment protections inside of our own home? And I think that's where we run short here. The government's really trying to hang its hat in this case, and I think that the district court and the magistrate judge that did the R&R, you know, I understand police have a very difficult job, and I do not dispute for a moment, you know, the government really sets its hat on the fact that domestic violence situations are particularly unpredictable, you know, uncontrollable. They can get violent very quickly, and I don't dispute that. I mean, there's certainly case law that says that. I think just common sense and practical experience tells us that police need to be on nerve in domestic situations. There's a lot to think about. There's a lot going on. Situations happen quickly. But the Fourth Amendment exceptions don't turn simply on generalities that police can possibly think about any given situation. I mean, any time a police gets called to a house, you know, and I'll talk about that for a moment, grandma didn't say anything about violence occurring. She said the granddaughter said mom and dad were fighting real bad. Now, based on training and experience, was it reasonable when the officers opened the door, they've heard that the occupants of the house were fighting, they see some scratches, they see Karina's, Ms. LeFrancois is crying, and you know, she says, don't tell him that she told you that she's the one that called. You know, certainly I think in that context that what the district court found, that they had a reasonable suspicion that there was some sort of an assault that may have occurred, that certainly Ms. LeFrancois may have been assaulted by her boyfriend in the house. But that is not the test for them to then enter the house. A reasonable suspicion that she's been assaulted is not the same thing as a reasonable suspicion that inside that house there currently exists an emergency that requires us to ignore your Fourth Amendment rights and go ahead and barge right in. And that is really where I think the problem lies in this case. I think... Counsel, why wouldn't the marks on LeFrancois' neck alone show that there was a potential threat to the child or to her? I'm sorry, I missed the first part of that question. Why wouldn't the marks on LeFrancois' neck alone show that there was a potential threat to the child and to her? Well, I think, Your Honor, you know, we have the case Smith v. Kansas City PD where there was a report of domestic violence situation. The woman had actually told police, I think this individual is the one that had assaulted me. When police arrive on the scene of the brother's house, I believe, is where the suspect was located, they see that the suspect is in the house. There is a child in the house and they go ahead and barge in. And this court said that was not enough. At most, at that particular moment, seeing those marks on Ms. LeFrancois' face, they might have suspected that she had, in fact, been assaulted just prior to their arrival. And they might have suspected that the person inside was the person that did it. They knew there were children in there. But I think it really is essentially the same thing as the Smith v. Kansas City case. But in that case, the court said that there were no facts indicating a threat to the child or the woman. Here, it seems to me that we do have facts. Well, I think we have facts indicating that possibly Karina had been assaulted. It's a reasonable suspicion. It's a reasonable hunch. But to then go a step further and say that simply because Karina may have been in some sort of a tussle with her boyfriend, we don't even know for sure what that's what happened. But isn't the comment about don't you know, don't tell the guy that the child reported this, isn't there a reasonable inference there that the reason you don't want the child identified is because there may be some harm that comes to the child as a result of that? Well, I'd answer that in two ways, Your Honor. First, I think that it's certainly reasonable for police to take that in when they're kind of evaluating how to behave in a particular scene. Alone, or even combined with anyone else, I do not think that that gives rise to a conclusion that there was currently an emergency situation. I think we just really need to get... Well, there's more than what you're talking about, though. We have grandma saying, my granddaughter called, she's reported there's a fight, and it's really bad. I really couldn't understand her very well because she was very upset. I don't know if there are weapons. There are not weapons there. And now what you've got is the statement that goes, don't tell them, and then you open the door and you hear crying of a child. You don't know which child is crying. You don't know why the child is crying. What you do know is that there's some evidence that something has happened that is physical in nature. There's evidence that that Karina is is very upset. She's been crying, and you've got a very animated child on the second floor that you've seen, and it's chaotic, right? And your original impulses bring them out, and at that point when you hear the crying you say, hold on, wait a minute. We need to do something else. And doesn't that, I mean, that sounds both reasonable and articulable to me. And now you say that there's no articulable reason there, and it's not reasonable. Why is it unreasonable at that point to say we need to take control of the situation? Well, I think the reasonable and articulable suspicion there is not that there's an emergency occurring inside the house. The reasonable and articulable situation is we might need to arrest someone. There's probably been an assault here. We need to investigate further. You know, there's indefinite line. Police are called to domestic disturbances all the time. I mean, I suspect I'm not a police officer. I suspect it's one of the most common things that they respond to. If every time they show up, and they suspect that an assault has occurred, and there happens to be a child crying inside, they're allowed to just go ahead and go right in. Well, that's not the facts. The facts are there's a fight. It's really bad. I don't know if it's physical or verbal. I couldn't understand my granddaughter very well. I'm not sure there are guns or weapons. That's a different story, right? I mean, you know, because you have an independent report, right? And, you know, don't get that many phone calls on 9-1-1 from the children reporting mom and dad are fighting. I mean, it just happens, but it's not the most common way that the officers are called. I mean, they would have some heightened awareness as opposed to just, this is a domestic where we've been called to. No question, Your Honor. Certainly, I think it's reasonable for them to have a heightened awareness, but at the end of the day, we still have this ultimate test. What did they know about what was going on in the house, and was what they knew sufficiently compelling to overcome that Fourth Amendment interest? You know, I don't think that there was a great deal of information available to the officers other than, as the government argued, there was a potentially dangerous situation. The magistrate, someone could have been in danger. The district court judge said there was reason to think that the child may have been at risk, and I would just comment in relation to the comment of don't tell him that we said that. Mr. Sanders was inside the house. He didn't hear the comment. He was not in a position where all of a sudden he was like, oh, the child called. I'm gonna run upstairs and choke her. That simply wasn't a possibility because Mr. Sanders was inside the house with the children. I would like to reserve a little bit of time for rebuttal, if I may. I'm down to two minutes, unless your honors have further questions at the moment. Is it Ms. Nidal? Okay. May it please the court, my name is Emily Nidal. I'm an assistant United States attorney in the Northern District of Iowa. I'm here representing the United States government. I'd like to start by discussing some of the additional facts that your honors and counsel have not discussed this morning that were also known to law enforcement. As I go through this, some of this is certainly things that you covered, but as noted, we have this call from Grandma. It's concerning in part because she can't eliminate things like firearms assaults. We know that there are three minors in the residence. We know that when police arrived, the child upstairs is crying and flailing or waving to law enforcement. Additionally, what hasn't been discussed this morning is the officer notes government's exhibit number one, Officer Cross's first body cam at approximately 115 once he's in the residence notes, I heard yelling when I was here. So in addition, when he arrives on scene, it appears that he hears yelling prior to making contact with the victim. Counsel, you would agree, wouldn't you, that a child crying in a residence alone is not enough to invoke the community caretaker exception? If the situation instead was hypothetically a law enforcement officer walking down the street and hears a child crying inside of a residence, no, I don't think that's sufficient to go inside of the residence, but that certainly wasn't what was here. We instead had the phone call. We had the child that was upset upstairs. Again, we had the yelling. The adult female comes out. She's clearly upset. She has injuries that are obvious and that law enforcement are able to see. When the doors open, they can hear crying coming from what sounds like downstairs. Opposing counsel argued that essentially in that the victim when she shuts the door had permission from law enforcement to do that and that they had given her that permission. A review of the video shows that the victim does indicate you're not allowed in the house. They said we have to speak to the defendant and she says, well, I'll tell him to come to the door. She doesn't say that she's going to go in. She doesn't say that she's going to close the door. You can tell in reviewing the video it appears that the law enforcement officers are somewhat surprised by the fact she goes into the door and then pulls it shut. They immediately begin their discussion at that time discussing the fact that there was the crying child upstairs that they have concerns and they make the immediate decision to go in. As noted previously, while the victim is still outside, she expresses concern that the defendant would find out that the child had called the police. Additionally, within the record, there was testimony that law enforcement officers know and are aware that in these sort of situations, domestic victims frequently minimize that they had time to deny anything happened despite the fact that things have occurred. And so the fact that the victim says, we're okay, we're fine, is something that law enforcement couldn't necessarily count on because in these situations, or what was suspected and ultimately turned out to be true, that victims in these situations downplay the situation in particular while their perpetrators are still on scene and in their presence. So based on all of these factors, let's admit that law enforcement had more than reasonable cause to go in the residence and find out what was going on, find out if everyone was safe. At the time they arrived, with the exception of the fact that a domestic victim or a perceived domestic victim said they were okay, nothing had alleviated any of the concerns that law enforcement had at the moment the door shut and clicked. Now once inside the residence, nothing dispels their concern. In fact, they're met instead by the defendant. He attempts to prevent law enforcement from going upstairs. He attempts to interfere with their interaction with her, and as soon as they're able to speak to the young female that's upstairs, they learn almost immediately that there was a gun involved in this incident. At that moment, we would submit that we have changed not only from a community caretaking, we now have an exigent circumstance, and at that point law enforcement is authorized to begin their search and eventual seizure of this weapon. Now in this instance, the video, this is, I think, a case that shows how valuable body cams can be because ultimately we have multiple officers with body cams. Those body cams then obviously interact at different points through different body cams. You can see different angles of what's occurring. While law enforcement is on scene, their search, as you can tell through all the body cams, is limited to these specific locations that they have either been told that this gun may be. They are told by the female upstairs that the gun is potentially in a cabinet downstairs. The officer then goes downstairs. The defendant is patted down to make sure he doesn't have the weapon, and then the search is limited to the cabinet. Around the same time that the defendant himself confirms that there is indeed a firearm in the residence, before the discovery of the firearm, the defendant also confirms that he is a felon to law enforcement. Ultimately, the firearm is not located in the cabinet. The officer then, Officer Cross, then goes up back upstairs, speaks to the female upstairs further, gets a little bit more of the story. He then goes outside, talks to the victim. At this point, it's additionally concerning that both the victim and the defendant, the two adults in the residence, have both indicated they do not know where this firearm is. Both acknowledge there is a firearm in the residence, but neither one of them is willing to tell law enforcement where the firearm is. So based on these circumstances, we had three children on scene, no adults that knew the location. They had all the factors that led them to be inside the residence, none of which had been dispelled, and ultimately then the firearm is found and recovered in a location that was next to where the defendant was seated. Admittedly, he was seated in that position because law enforcement told him sit on the couch, but it shows how dangerous the situation was that they unknowingly put this individual next to the firearm. So based on that, we believe that up until and past the moment of the discovery of that firearm, law enforcement was both justified to be in the residence and to search and ultimately seize the weapon, again in the limited scope that they looked only for the weapon. Ms. Neidl, I think there is also a dispute in this case as to whether Mr. Sanders had standing to assert a Fourth Amendment claim. Seems to me the evidence shows that he lived there. Why would he not have standing? There are, throughout the criminal system, multiple rights that we have, and some of those include our Fourth Amendment rights. Ultimately, defendants are able to waive those. I would submit in this case, this defendant, upon entry of law enforcement, immediately said, this isn't my house. This is her house. You have to listen to her. You have to listen to her. And so ultimately, we would be in a position to concede this was his residence, but had he not made those assertions, that he doesn't lose, or he would have had standing. I think the record's clear, both through discussions with the child, the female, and I think ultimately after the defendant's arrest, that this was indeed his residence. But you could say, this is not my house. It's her house, and you could still be residing there. I mean, it could be a true statement of fact. The owner of the house is someone other than myself, right? And you need to listen to her. Yes, but he, at different points, also says, this is not my residence. Additionally, one of the prongs, or things that the court would need to find, was that also the abandonment. The defendant does attempt to leave. It's in the video, as the officer cross finds out there's a firearm, and he comes, essentially running down the steps to make sure, to see what's going on at that point. In Government's Exhibit 1, the defendant's seen attempting to leave. Then in Government's Exhibit 2, with the officer that's actually with him at the time, he basically says, I'm out of here. I'm leaving. So he makes an attempt, then, to actually physically abandon the property. He stopped, ultimately, because law enforcement is aware that there is a firearm, but he does make that attempt. And I think the standing argument does not go to the exigency at that point, or pardon me, not the exigency, the community caretaking. At the moment they enter the residence, the defendant hasn't waived any rights he has at that point. And again, we haven't, we're not arguing that he never had standing. It's a waiver argument. So, ultimately, community caretaking has to stand on its own, but it's, instead, this exigency, at some point, or points during that, does he waive his standing? Additionally, in this case, Your Honors, we have before you questions regarding the defendant's sentence. We would argue that, based on the defendant's recordings with his victim, indicating that the statements or interviews need to go away, supports the finding of the district court that there was, indeed, obstruction in this case. Based on the finding of obstruction, acceptance was properly denied in this case. As noted by the district court, the defendant, up and through sentencing, continued to deny that that was an attempt to obstruct justice. And, based on that, we would submit that not only the motion to suppress should be, the denial of the motion to suppress should be affirmed, but, additionally, this defendant's sentence should be affirmed. Absent any questions from the court, I would concede the rest of my time. Thank you. Your Honors, we're certainly not, by any stretch of the imagination, contending that the officers had to just up and leave the scene. I mean, the question is, what was reasonable? What would a reasonably trained officer do in this circumstance? And, when we're looking at the totality of the circumstances, you know, we have these things that the officers did know. We have a suspicion, even a reasonable suspicion, that Ms. LeFrancois has been assaulted. That doesn't necessarily lead to a conclusion that the children are in any sort of danger in the house. People fight all the time and never lay a finger on their children. It certainly doesn't give rise to a conclusion that those children are in an emergency, urgent, compelling danger right now that we need to go inside that house to protect them. But, you know, when we're looking at the totality of the circumstances, it's not just what did they know that supports going in. We have to look at the entire scene. We also have to look at what they didn't know. They didn't know there was a gun there. There was no information indicating that there was. They didn't know that a physical assault had, in fact, actually occurred. No reports past domestic violence incidents at this particular address. They didn't see any blood. There was no indication of exactly how fresh those wounds were. They certainly weren't actively bleeding at the time. They didn't ask Ms. LeFrancois, what happened to your face? They didn't ask Ms. LeFrancois, did he hit you? They didn't ask Ms. LeFrancois, do you think there's any danger? And in fact, Ms. LeFrancois very calmly told them on the porch as the body cameras show, we're all fine. We're all fine. That counts for something. Now, certainly they could think that she's a domestic violence victim and she's diminishing what might have happened, but does that automatically mean, well, gosh, we get a run right in and make sure everybody's okay? You know, the government says, conceded that a crying child alone is not enough. But where do we draw that line? And I think that's ultimately the question that we have to ask here. If we apply the caretaker exception in this case, I think that we've gone down a very slippery slope where the exception truly does swallow the rule. And for those reasons, your honors, unless there are further questions, I would request that you reverse and remand the case. Seeing none, thank you.